**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 9 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

MARILYN KAY PLANTZ,

Petitioner-Appellant,

v.

NEVILLE MASSIE, Warden;
ATTORNEY GENERAL OF
THE STATE OF OKLAHOMA,

Respondents-Appellees.

No. 99-6075
(D.C. No. 97-CV-963-R)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRORBY**, **PORFILIO**, and **LUCERO**, Circuit Judges.

Petitioner Marilyn Kay Plantz was convicted in Oklahoma of first degree

murder, solicitation to commit murder, third degree arson, and conspiracy to

commit murder. She received the death penalty for first degree murder,

100 years' imprisonment for solicitation, fifteen years' imprisonment and

a $10,000 fine for arson, and ten years' imprisonment and a $5000 fine for

---

[*]     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

conspiracy.[1] The Oklahoma Court of Criminal Appeals affirmed petitioner's convictions and sentences, *see Plantz v. State*, 876 P.2d 268 (Okla. Crim. App. 1994), *cert. denied*, 513 U.S. 1163 (1995), and affirmed the state district court's denial of post-conviction relief, *see Plantz v. State*, 936 P.2d 339 (Okla. Crim. App. 1997).

Thereafter, petitioner filed a petition for habeas corpus relief in federal district court. In a very thorough and careful opinion, that court denied habeas relief. We affirm.

The facts in this case are set forth in this court's opinion in *Bryson v. Ward*, 187 F.3d 1193, 1197-99 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 1566 (2000):

> Bryson first met his co-defendant Marilyn Plantz in late 1987 or early 1988 when he was sixteen and she was in her late twenties and married. In the spring of 1988, they became romantically involved and sexually intimate. Plantz allowed Bryson to drive her car, entertained him and his friends at her home while her husband worked at night, and either provided Bryson with money to purchase alcohol and crack cocaine or purchased them for him.
>
> Also in the spring of 1988, Bryson became acquainted with co-defendant Clinton McKimble. Like Bryson, McKimble was a teenager. McKimble knew that Bryson and Plantz were romantically involved. Bryson and Plantz asked McKimble to help them kill Mr. Plantz.

---

[1]    Petitioner was tried jointly with her co-defendant William Clifford Bryson, who was convicted of the same offenses and received the same sentences. A third co-defendant, Clinton McKimble, pleaded guilty to first degree murder and was sentenced to life imprisonment.

Having indicated that Mr. Plantz was abusive and that she wanted to kill him to obtain life insurance proceeds, Marilyn Plantz initiated several plans to kill him. She gave Bryson a gun to kill Mr. Plantz, but Bryson either sold or pawned it. Another time, Marilyn Plantz suggested that she lure her husband home from work and that Bryson and McKimble ambush him when he arrived. A third suggestion was that Bryson and McKimble push Mr. Plantz off a boat while fishing and let him drown. None of these schemes was carried out.

On August 17, 1988, one of Marilyn Plantz's schemes was carried further but ultimately failed. Bryson, McKimble, and Rory Jenkins, aided by Marilyn Plantz, stole a car they planned to use to run Mr. Plantz off the road. Although they followed Mr. Plantz from his workplace, they were unable to carry out the plan because Mr. Plantz took an unexpected route home and Jenkins did not want to go through with the plan.

McKimble offered Roderick Farris $7000 to help kill Mr. Plantz. Farris refused the offer. Subsequently, Bryson offered Farris $40,000 if he would kill Mr. Plantz without Bryson's involvement. When asked by Farris how he intended to kill Mr. Plantz, Bryson indicated that he could catch Mr. Plantz coming home from work, beat him with a bat, and set him on fire in his truck. A few days later, Bryson introduced Farris to Marilyn Plantz. At that time, Bryson offered Farris $10,000 to kill the victim. Marilyn Plantz explained that the killing had to look like an accident. Later that night, Farris was arrested for unrelated reasons.

On August 25, 1988, Plantz, Bryson, and McKimble were together. She withdrew money from her bank, purchased crack cocaine and beer for them, and drove them around until Mr. Plantz had gone to work. The three then went back to her house. Bryson and McKimble drank the beer, smoked the crack cocaine, and fell asleep in the front room. The sound of keys in the front door awakened them. Bryson and McKimble hid in the kitchen with baseball bats supplied by Marilyn Plantz. When Mr. Plantz entered the kitchen, Bryson struck him on the back of the head with the bat. McKimble joined in the beating, while Marilyn Plantz waited in her bedroom. The two men carried Mr. Plantz to his pickup parked in

front of the house and placed him in the truck bed. Marilyn Plantz told them that Mr. Plantz must be burned to make the death look like an accident because Mr. Plantz was beaten so badly. At that time, Mr. Plantz was insured for approximately $299,000.

Bryson and McKimble drove the truck and Marilyn Plantz's car to an isolated area. They placed Mr. Plantz's body in the cab of the truck. McKimble placed a rag in the truck's gas tank and lit it, attempting to cause an explosion. When that did not work, Bryson poured gas in and around the truck and lit it. The truck and Mr. Plantz ignited. Mr. Plantz was alive, but perhaps unconscious, when Bryson and McKimble placed him in the truck and ignited it.

Bryson and McKimble returned to the Plantz home and found Marilyn Plantz cleaning up the blood. . . .

Over the next two days, Bryson and McKimble told some friends about the murder. Bryson told one friend that he planned to move out of town with Marilyn Plantz and purchase a house. McKimble said that he had expected to be paid for the murder.

Bryson was interviewed by police detectives two times after the murder. Although he initially denied involvement, he later confessed. In the second interview, he admitted his relationship with Marilyn Plantz and his drug habit.

## I. STANDARDS OF REVIEW

Contrary to petitioner's assertion, the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply to this case, because petitioner filed her habeas petition after AEDPA's effective date. *See Williams v. Taylor*, 120 S. Ct. 1479, 1486 (2000).

The scope of this court's review of the district court's decision depends on whether a particular claim was decided on its merits in state court. "If the claim

-4-

was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, [this court] review[s] the district court's conclusions of law *de novo* and its findings of fact, if any, for clear error." *LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999). If the state courts adjudicated the claim on its merits, petitioner is not entitled to habeas relief unless the state court's ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000). State court determinations of factual issues are presumed correct. *See* 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting the presumption by clear and convincing evidence. *See id.*

## II. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Petitioner argues her trial counsel was ineffective for failing to adequately investigate mitigating evidence concerning her background and childhood, and failing to request a mental health expert to evaluate her.

### A. PROCEDURAL BAR

Petitioner first raised ineffective assistance of trial counsel in state post-conviction proceedings. The Oklahoma Court of Criminal Appeals determined the claim was waived. *See Plantz*, 936 P.2d at 341. The federal district court, however, concluded the claim was not procedurally barred. Respondent does not argue procedural bar. We therefore proceed to the merits, *see Moore v. Gibson*, 195 F.3d 1152, 1178 (10th Cir. 1999) (citing *Hooks v. Ward*, 184 F.3d 1206, 1216-17 (10th Cir. 1999)), *cert.* denied, No. 99-8812, 2000 WL 343946 (U.S. May 30, 1999), reviewing the district court's decision *de novo*, *see LaFevers*, 182 F.3d at 711.

### B. MERITS

Ineffective assistance of counsel claims are mixed questions of law and fact. *See Williamson v. Ward*, 110 F.3d 1508, 1513 (10th Cir. 1997). To obtain habeas relief for ineffective assistance of counsel, petitioner must establish both that her attorney's representation was deficient and that she was prejudiced by that deficiency. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"An ineffective assistance claim may be resolved on either performance or prejudice grounds alone." *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000).

### 1. INADEQUATE INVESTIGATION

Petitioner argues counsel should have discovered and presented mitigating evidence that she was forced to masturbate her brother, she was beaten on the legs by her father on one occasion with thorn branches resulting in bleeding, and she was raped by Mr. Plantz at age fifteen, before her marriage to him. Also, she argues trial counsel should have informed the jury of her difficult and impoverished childhood and her father's racial prejudice and strictness, causing his children to leave home as soon as possible.

The federal district court determined petitioner failed to show either that counsel's performance was deficient or that she was prejudiced. The court rejected the allegations of childhood poverty, and petitioner's father's strictness and racial prejudice, as remote and insufficient mitigating evidence. The court also rejected the more serious allegations of childhood sexual abuse and rape, if supported, as too remote in time and of doubtful value as mitigating evidence.

Without considering whether counsel's failure to investigate and present potential mitigating evidence was deficient performance, we conclude petitioner has failed to show a reasonable probability the mitigating evidence she now points to would have changed the jurors' sentencing determination.

*See Strickland*, 466 U.S. at 695. Petitioner merely makes a conclusory assertion that she was prejudiced. *See* Appellant's Br. at 20. Although her childhood was relevant mitigating evidence, petitioner fails to present any evidence indicating that these specific childhood events had a continuing effect on her ability to conform her conduct to noncriminal behavior. *See Stafford v. Saffle*, 34 F.3d 1557, 1565 (10th Cir. 1994). On numerous occasions, this court has determined evidence of a troubled childhood does not outweigh evidence supporting the conviction and evidence supporting aggravating circumstances. *See Foster v. Ward*, 182 F.3d 1177, 1189 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 1438 (2000). Petitioner's case is not an exception. *Cf. Williams*, 120 S. Ct. at 1514-16 (discussing mitigating evidence which was prejudicial). In light of the nature of the crime and the strength of the State's case at both stages of trial, it is not reasonably probable the additional mitigating evidence petitioner now points to would have affected the outcome at the sentencing stage. *See Clayton v. Gibson*, 199 F.3d 1162, 1179 (10th Cir. 1999), *petition for cert. filed,* (U.S. May 20, 2000) (No. 99-9630).

### 2. MENTAL HEALTH EVALUATION

Petitioner argues counsel failed to seek a mental health expert to evaluate her before trial. Dr. Fischer's affidavit, presented at the state post-conviction proceedings, indicated petitioner has a full scale IQ of 76, suggesting borderline intelligence. Dr. Fischer believed that, given petitioner's limited intellectual functioning, her submissive, dependent personality style, and her disorganized thought processes, it was "highly improbable" she was capable of creating a scheme to murder her husband. Furthermore, due to Mr. Plantz's dominant role and his perception of petitioner as stupid and inferior, Dr. Fischer believed it was "unlikely" petitioner knew the details of Mr. Plantz's personal business. Petitioner maintains this evidence was relevant and should have been presented at both stages of trial because it showed she lacked the ability to form the necessary intent to "mastermind" first degree murder and because it would have been mitigating evidence.

The federal district court determined (1) no indicia of incompetence or mental illness were apparent prior to trial; (2) petitioner and her counsel had discussions during the trial and counsel never questioned her mental state during trial; (3) she never informed counsel of a mental impairment, and she does not suggest either counsel or the trial court should have recognized she was mentally impaired; (4) even if counsel had attempted to obtain a mental health expert, counsel could not have made the required showing for an expert; (5) petitioner

failed to show any likelihood the outcome of the proceedings would have been different if a mental health expert had been appointed; and (6) Dr. Fischer's opinion was highly speculative and contrary to the weight of the evidence at trial indicating petitioner initiated the murder scheme, actively planned the murder, and hid evidence.

Again, we proceed directly to prejudice. We agree with the district court that it is doubtful the trial court would have appointed a mental health expert even if counsel had requested one. Nothing in the record suggests that petitioner's mental state or sanity at the time of the offense could have been a significant factor at either stage of trial or that her mental condition was a potentially mitigating factor. *See Ake v. Oklahoma*, 470 U.S. 68, 74 (1985); *Mayes v. Gibson*, 210 F.3d 1284, 1289 n.3 (10th Cir. 2000); *Smith v. Gibson*, 197 F.3d 454, 463 (10th Cir. 1999), *petition for cert. filed,* (U.S. May 19, 2000) (No. 99-9652). The evidence showed petitioner devised most of the schemes to murder her husband. None of the schemes was complex. Nothing in the record suggests she did not know the difference between right and wrong or that she would not understand the consequences of her acts. *See Jones v. State*, 648 P.2d 1251, 1254 (Okla. Crim. App. 1982). Rather, Dr. Fischer indicated petitioner was oriented to time, place, and date. At no time during court proceedings was her behavior inappropriate. Her *in camera* testimony regarding her decision not to testify or to

allow her children to do so was coherent and rational. Additionally, her low IQ does not outweigh evidence supporting both aggravating circumstances. *See Smith*, 197 F.3d at 463. Considering the totality of the evidence, there is no reasonable probability the jury would have determined petitioner was not involved in planning the murder and therefore not guilty of first degree murder. *See Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 1188 (2000). Also, in light of the strength of the State's case, it is doubtful any mental health testimony would have changed the outcome at sentencing. *See Moore v. Reynolds*, 153 F.3d 1086, 1098 (10th Cir. 1998), *cert. denied*, 526 U.S. 1025 (1999).

III. REFUSAL TO GRANT SEVERANCE

Petitioner argues she was denied a fair trial when the trial court refused to sever her trial from co-defendant Bryson's. Petitioner maintains their defenses were mutually antagonistic and inconsistent, she was unable to cross-examine Bryson about his hearsay statements, and Bryson presented improper second stage evidence.

A. ANTAGONISTIC DEFENSES

Petitioner argues she and Bryson had mutually antagonistic and inconsistent defenses because Bryson's defense was that she lured him into committing the crime and her defense was that she was uninvolved. On direct criminal appeal,

the Oklahoma Court of Criminal Appeals determined the co-defendants did not present mutually antagonistic defenses, such that each attempted to exculpate himself or herself by inculpating the other. *See Plantz*, 876 P.2d at 273. The federal district court found that, although the co-defendants attempted to shift blame, neither offered evidence which would have required the jury to disbelieve the defense presented by the other. Accordingly, the court concluded petitioner and Bryson did not offer mutually antagonistic defenses requiring separate trials.

Generally, severance is a question of state law not cognizable on habeas. *See Fox*, 200 F.3d at 1292 (citing *Cummings v. Evans*, 161 F.3d 610, 619 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 1360 (1999)). There is no constitutional right to severance without a strong showing of prejudice caused by the joint trial. *See id.* Severance is not necessary merely because theories conflict or because one defendant is attempting to cast blame on another. *Cf. United States v. Dirden*, 38 F.3d 1131, 1141 (10th Cir. 1994) (direct criminal appeal). Rather, a petitioner must show "real prejudice." *See Fox*, 200 F.3d at 1293. "Such . . . prejudice is shown if the defenses are truly mutually exclusive, such that 'the jury could not believe the core of one defense without discounting entirely the core of the other.'" *Id.* (quoting *Dirden*, 38 F.3d at 1141). "Mutually antagonistic defenses are not prejudicial *per se*." *Zafiro v. United States*, 506 U.S. 534, 538 (1993).

Here, the defenses of noninvolvement and of lesser culpability due to intoxication and influence were not mutually antagonistic. [2] *See Ochoa v. State*, 963 P.2d 583, 596 (Okla. Crim. App. 1998) (casting blame on another defendant is not enough for separate trials), *cert. denied*, 526 U.S. 1023 (1999); *Spunaugle v. State*, 946 P.2d 246, 251 (Okla. Crim. App. 1997) (deciding defenses are antagonistic only if each defense is complete defense to guilt and involuntary intoxication and influence are not complete defenses to guilt). Thus, petitioner failed to show the joint trial was prejudicial. [3] We conclude the Oklahoma Court of Criminal Appeals' decision was not unreasonable.

---

[2] Petitioner argues Bryson's voir dire and guilt stage opening statement show antagonistic defenses. During voir dire, Bryson's attorney's asked "Doesn't make you wonder what she's doing with an 18-year old black kid?" Tr. vol. II at 516. We agree with the district court that this question did not inculpate petitioner. She also complains about remarks Bryson's attorney made in opening statements regarding petitioner's relationships with other black men and her attempting to solicit them to kill her husband. Again, we agree with the district court that petitioner failed to show how these remarks were so prejudicial that she was entitled to a separate trial.

[3] Even assuming a risk of prejudice, the instructions, which the jury presumably followed, *see Richardson v. Marsh*, 481 U.S. 200, 206 (1987), sufficed to cure any possibility of prejudice. *See Zafiro*, 506 U.S. at 539, 540-41. The trial court instructed the jury that petitioner and Bryson were innocent unless the State proved guilt beyond a reasonable doubt, the jury could return different verdicts for the two, and the jury must give separate consideration to each defendant. *See* Tr. vol. V at 1459-60, 1474.

B. HEARSAY

Petitioner argues that joinder permitted introduction of much incriminating hearsay evidence admissible only against Bryson and that she was denied her right to confront Bryson about his incriminating statements. The Supreme Court held in *Bruton v. United States*, 391 U.S. 123 (1968), that "a defendant is deprived of [her] rights under the Confrontation Clause when [her] codefendant's incriminating confession is introduced at their joint trial," regardless of any limiting instructions given the jury. *Cruz v. New York*, 481 U.S. 186, 187-88 (1987). Statements that are probative of the existence of a conspiracy and of both defendants' participation in the conspiracy, however, are properly admitted. *Cf. Bourjaily v. United States*, 483 U.S. 171, 181-82 (1987).

Even if statements implicate the defendant directly, their admission, under the facts of the case, may be harmless error. *See Brown v. United States*, 411 U.S. 223, 231 (1973) (*Bruton* errors are harmless if erroneously admitted testimony was cumulative to other overwhelming uncontroverted evidence properly before jury); *United States v. Glass*, 128 F.3d 1398, 1403 (10th Cir. 1997) (*Bruton* violation is harmless if, considering totality of evidence and context of challenged testimony, properly admitted evidence of defendant's guilt is overwhelming and prejudicial effect of co-defendant's statement was insignificant by comparison).

First, petitioner objects to the testimony of Detective Gibson, who interviewed Bryson. Detective Gibson testified that Bryson confessed to having a romantic relationship with petitioner, using illegal drugs during the relationship, and being involved in the murder. On direct criminal appeal, the Oklahoma Court of Criminal Appeals determined Detective Gibson's testimony did not deny petitioner her right to confrontation. *See Plantz*, 876 P.2d at 279-80. The federal district court agreed.

Detective Gibson's testimony did not incriminate petitioner. Even if it had, it was cumulative, and therefore harmless, because both McKimble and Michael Kendrick testified through personal knowledge about petitioner's and Bryson's relationship, McKimble testified from his personal knowledge that petitioner purchased alcohol and drugs on numerous occasions, and McKimble testified about petitioner's involvement in the murder. Thus, the Oklahoma Court of Criminal Appeals' determination--that petitioner was not denied her constitutional right of confrontation by the admission of Detective Gibson's testimony--was not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner next complains that first stage witnesses Terry Norman, Derrick Jones, Kendrick, and Ricky John Dunn all testified about incriminating hearsay statements Bryson made about petitioner's and his involvement in the murder. On direct criminal appeal, the Oklahoma appellate court determined most of the

statements related to petitioner's relationship with Bryson and his planning and commission of the crime. The court, however, found that certain testimony of Norman and of Kendrick was improperly admitted against petitioner in violation of *Bruton*. *See Plantz*, 876 P.2d at 280. The court declined to reverse, however, because petitioner did not object to the statements and because any error was harmless beyond a reasonable doubt. *See id.* (citing *Chapman v. California*, 386 U.S. 18 (1967)). The court concluded "[t]he improperly admitted statements were merely cumulative of other overwhelming and largely uncontroverted evidence of [petitioner's] role in the conspiracy and murder properly before the jury." *Id.* The federal district court agreed, and further concluded much of the other complained of testimony fell under the co-conspirator hearsay exception, did not incriminate petitioner, or was harmless in light of the cumulative testimony of McKimble.

On appeal, petitioner specifically complains only of testimony by Norman that petitioner told him "we" had committed the murder and testimony by Kendrick that petitioner provided clothes to Bryson after the murder.[4] She maintains this testimony was not in furtherance of the conspiracy. We agree.

---

[4] On appeal, petitioner does not make specific complaints regarding Jones' and Dunn's testimony. We have reviewed their testimony and the testimony of Norman and Kendrick in full and conclude none of the testimony violates petitioner's right to confrontation.

Norman's testimony, however, does not specifically incriminate petitioner. Evidence of guilt, established by McKimble's testimony, showed the testimony of both Norman and Kendrick was harmless. We conclude the Oklahoma Court of Criminal Appeals' determinations were not contrary to or an unreasonable application of Supreme Court precedent.

### C. BRYSON'S SECOND STAGE EVIDENCE

Petitioner argues that because she was required to present her mitigation evidence first she was not allowed an opportunity to defend herself against the attacks made by Bryson during the presentation of his mitigating evidence. Although asserted on direct appeal, the Oklahoma Court of Criminal Appeals did not discuss this issue. Thus, we review the district court's determination *de novo*. As the district court noted, petitioner did not ask for an opportunity to present additional mitigating evidence after Bryson presented evidence, and at no time has she indicated what evidence she would have offered to rebut Bryson's second stage evidence. In any event, most of Bryson's second stage evidence focused on his family background and his mental state and did not implicate petitioner in any way. Also, petitioner complains she had no notice she would have to defend against aggravating evidence presented by Bryson. She, however, cites no authority indicating entitlement to such notice.

For alleged attacks by Bryson, petitioner points to the testimony of Bryson's father indicating that he had advised Bryson to break off his relationship with petitioner. Although asked by Bryson's attorney whether Bryson came to him regarding the killing, the trial court would not allow Bryson's father to answer. He was only allowed to testify that Bryson was troubled by a statement petitioner had made to Bryson and that he had advised Bryson to stay away from petitioner. Even if this testimony could be characterized as incriminating, it is harmless because it is less incriminating than the testimony presented during the first stage of trial. Petitioner was aware of the first stage evidence and made no attempt to rebut it at the second stage.

Petitioner further complains that Bryson's mental health expert testified that petitioner represented the "bad mother" to Bryson. After the witness was told to confine his testimony to Bryson, he clarified that he was only referring to Bryson's perceptions. We agree with the district court that this testimony did not incriminate petitioner.

## IV. DENIAL OF PEREMPTORY CHALLENGES

Petitioner argues that she was denied a fair trial and an impartial jury because she was required to share peremptory challenges with Bryson despite their allegedly inconsistent defenses. *See* Okla. Stat. tit. 22, § 655 (1981) (providing that when two first degree murder defendants have inconsistent

defenses, each is entitled to nine peremptory challenges; otherwise, they share peremptory challenges). She contends she was prejudiced because she was unable to challenge three jurors--Nellie Fay Haynie, Pamela K. Crownover, and Sherman I. Roberts--who served on the jury.

On direct appeal, the state appellate court held petitioner was not entitled to nine peremptory challenges because § 655 applies only to inconsistent legal defenses presented at the first stage and any inconsistencies arose only during the second stage. *See Plantz*, 876 P.2d at 276-77. The federal district court determined petitioner failed to prove a constitutional claim. Because only the federal district court reviewed for federal constitutional error, our review is *de novo*.

Petitioner received the peremptory challenges to which she was entitled under state law. *See Hammon v. State*, 898 P.2d 1287, 1301 (Okla. Crim. App. 1995) (providing that where inconsistency goes to the level of each defendant's culpability, co-defendants may be required to share peremptory challenges). Therefore, any constitutional challenge to the number of peremptory challenges she received fails. *See Ross v. Oklahoma*, 487 U.S. 81, 88, 89, 91 (1988); *see also Cummings*, 161 F.3d at 619 ("The number of peremptory challenges is a matter of state law that raises no constitutional concerns.").

Nonetheless, she had a right to an impartial jury. *See Ross*, 487 U.S. at 85; *see also Batson v. Kentucky*, 476 U.S. 79, 91 (1986) (peremptory challenges are means of assuring selection of qualified, unbiased jury). As the district court found, petitioner did not show her jury was partial.

Although Ms. Haynie believed Oklahoma is too lax with the death penalty and it should be reserved for the worst cases where there is no choice, we agree with the district court that Ms. Haynie's responses were invited by petitioner's counsel's inquiry. Further, at no time did she indicate she would not be fair.

The district court correctly determined that Ms. Crownover had not given serious consideration to her views on the death penalty before she arrived for jury duty. This, however, did not indicate she would not give fair consideration to each of the possible punishments. Indeed, she presumed the co-defendants were innocent of the charges until proven guilty, could agree to impose any of the three possible punishments, would apply the law as instructed, would consider all possible mitigating evidence, needed to hear both sides before making up her mind whether a defendant should receive the death penalty, and was sure there could be things she had not really thought about which could persuade her life or life without parole would be the appropriate sentence.

Mr. Roberts volunteered he formerly worked with the trial judge's sister but it would have no affect on his serving as a juror, complained that he did not know

-20-

the rules about when he could use the restroom, had facial pain controlled by medication which did not affect his judgment, and was recovering from back surgery. He also indicated he could consider all possible punishments and give the defendants a fair and impartial trial. Again, we agree with the district court that nothing indicated Mr. Roberts would not be a fair and impartial juror.

## V. FAILURE TO REMOVE JURORS FOR CAUSE

Petitioner argues the trial court's failure to remove two jurors--C.O. Pouder and Loretta C. Mess--for cause denied her a fair trial. Petitioner and Bryson removed these jurors with peremptory challenges. Petitioner argues the trial court's failure to remove these jurors required her to use peremptory challenges that could have been used to remove Ms. Haynie, Ms. Crownover, or Mr. Roberts. On direct appeal, the Oklahoma appellate court determined any error with respect to Mr. Pouder was waived because petitioner failed to challenge him for cause. *See Plantz*, 876 P.2d at 277. Concerning Ms. Mess, the court determined that the record showed she would be a fair and impartial juror. *See id.* at 277-78 (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Morgan v. Illinois*, 504 U.S. 719, 733-36 (1992)). The court therefore concluded petitioner was not unfairly forced to remove these two prospective jurors with peremptory challenges. *See id.* at 278. The federal district court found that petitioner failed to show the views expressed by either of these two would have required the trial court to disqualify

-21-

them, and, even if they were partial, peremptory challenges to achieve their removal did not violate petitioner's right to an impartial jury.

It is settled that "'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 420 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)) (emphasis omitted). "A trial judge's determination of a potential juror's bias under this standard is a factual finding entitled to a presumption of correctness." *Moore*, 195 F.3d at 1168. The trial judge assesses the credibility of the prospective juror, something an appellate court cannot easily do based upon a record. *See id.*

Although the state appellate court determined an objection to Mr. Pouder was waived, respondent does not argue procedural bar. Accordingly, this court may proceed to the merits. *See Moore*, 195 F.3d at 1178.

When Bryson's counsel questioned Mr. Pouder about punishment, he responded as follows:

> PROSPECTIVE JUROR POUDER: –I feel like that–well, an eye for an eye. You know, that's the way I feel about it.
>
> MRS. BAUMANN: Okay. And to you an eye for an eye means if you kill someone then you should die for what you did?
>
> PROSPECTIVE JUROR POUDER: I feel like I should, I guess, yes. If–yes.

-22-

Tr. vol. II at 272. He, however, later stated that he would consider everything in making a decision, he did not have a preconceived idea about guilt, he was open-minded, and he would consider all punishments. On the whole, Mr. Pouder's voir dire testimony indicated his views would not have prevented or substantially impaired the performance of his duties as a juror.

Ms. Mess stated that if the defendants are guilty "I feel like they need to pay for it," *id.* at 504, and need to die or be punished to the fullest extent. Also, she stated

> Well, sometimes in my mind I feel like they need to get the same thing that they give that man. Maybe I'm too harsh on people, but that's what's wrong with the system. They let these people get by with stuff and they put them off in the penitentiary for the rest of their life and we pay taxes and feed them and they sit there and get educated and --

*Id.* at 505. Although Ms. Mess indicated that at the time she first learned of the crime she believed the perpetrator(s) should receive the death penalty, she continually stated that she would need to listen to the evidence to make a decision as to which punishment would be appropriate. She believed she could be fair and consider all possible punishments and was not predisposed to one. Petitioner has failed to rebut with clear and convincing evidence the trial court's factual finding that Ms. Mess would be a fair and impartial juror. The Oklahoma Court of Criminal Appeals' determination that she would be a fair and impartial juror was not contrary to or an unreasonable application of Supreme Court precedent.

-23-

Even if Mr. Pouder and Ms. Mess should have been removed for cause, petitioner's use of a peremptory challenge to achieve an impartial jury caused no constitutional error. *See United States v. Martinez-Salazar*, 120 S. Ct. 774, 777 (2000); *Ross*, 487 U.S. at 88.

## VI.  FAILURE TO EXCUSE JUROR FOR CAUSE

Petitioner argues the trial court's failure to excuse prospective juror Deborah Hicks for cause deprived her of a fair trial.  Petitioner again contends she was unable to remove Ms. Haynie, Ms. Crownover, or Mr. Roberts since she was required to use a peremptory challenge to remove Ms. Hicks.

Ms. Hicks stated during voir dire that she previously worked with the victim's father and attended the victim's funeral out of respect for the victim's father, although she did not know the victim.  Bryson moved to excuse Ms. Hicks for cause.  The trial court overruled the motion in light of Ms. Hicks' answers that she could be fair.  Petitioner used a peremptory challenge to remove Ms. Hicks. The Oklahoma Court of Criminal Appeals, on direct appeal, concluded petitioner waived any error by passing Ms. Hicks for cause.  *See Plantz*, 876 P.2d at 278.  The federal district court determined that even if the trial court erred in failing to remove Ms. Hicks for cause, the failure did not violate petitioner's constitutional rights because Ms. Hicks did not actually sit on the jury.

Respondent does not argue procedural bar. This court may consider this issue on its merits. *See Moore*, 195 F.3d at 1178. Reviewing *de novo*, and assuming that Ms. Hicks should have been removed, despite her assurances of open-mindedness, we agree with the district court that there was no constitutional error when petitioner used a peremptory challenge to achieve an impartial jury. *See Martinez-Salazar*, 120 S. Ct. at 781-82*; Ross*, 487 U.S. at 88.

## VII. IMPROPER REMOVAL OF THREE JURORS FOR CAUSE

Petitioner argues the trial court violated her constitutional rights by improperly removing three jurors--Celam Vaughn, Cheryl K. Morgan, and Thomas J. Maciula--for cause at the State's request. On direct criminal appeal, the Oklahoma appellate court concluded the trial court properly excused these jurors for cause because Mr. Vaughn was irrevocably opposed to the death penalty, Ms. Morgan continually expressed doubts about her ability to be impartial in light of her personal experiences, and Mr. Maciula's religious views prevented him from being fair and impartial. *See Plantz*, 876 P.2d at 278-79. The federal district court agreed.

Mr. Vaughn initially stated he could not agree to a verdict imposing the death penalty, but he could possibly consider it, even though he did not believe in taking the life of another person. After further questioning, he stated he did not believe he could give equal consideration to the law. Bryson's attorney requested

and was given an opportunity to rehabilitate Mr. Vaughn. During that questioning, Mr. Vaughn indicated that to the best of his ability he would follow the law and listen to the evidence, but he would be opposed to the death penalty and following the law would depend on his personal beliefs, which he did not believe the State could persuade him to change. Finally, he conceded that his mind was made up. The record is clear that Mr. Vaughn would listen to the evidence but he would not consider imposing the death penalty. *See Morgan*, 504 U.S. at 728 (holding juror who would not vote for death penalty is not impartial and must be removed for cause).

Ms. Morgan's husband was in prison for rape and robbery. She expressed concern over her husband's well being, apparently with respect to Bryson. At one time, she indicated that she was open-minded and would consider all possible punishments. Later, however, she stated she would try to be fair but would be sympathetic towards the defendants. Ms. Morgan's concern for her husband's welfare, as well as her sympathy for the defendants, would have prevented or substantially impaired performance of her duties as a juror.

Mr. Maciula initially expressed religious concerns about the death penalty, but indicated he could consider and impose the death penalty in an appropriate case. Later, he stated that he was not certain he could consider the death penalty and he could not consider all three punishments. It is clear that Mr. Maciula's

religious beliefs precluded him from considering the death penalty. *See Morgan*, 504 U.S. at 728.

Petitioner has failed to rebut the presumption of correctness afforded to the trial court's finding that these prospective jurors' views would have prevented or substantially impaired his or her performance of the duties of a juror. The Oklahoma Court of Criminal Appeals' determination was not contrary to or an unreasonable application of Supreme Court precedent.

## VIII. OTHER VOIR DIRE ISSUES

Petitioner argues the trial court's refusal (1) to allow her to voir dire potential jurors concerning their views of mitigating evidence and (2) to permit individual voir dire concerning views on capital punishment denied her a fair trial. The Oklahoma Court of Criminal Appeals, on direct criminal appeal, noted that there was no evidence petitioner's voir dire was restricted in any way. *See Plantz*, 876 P.2d at 279. The court concluded, based on state law, that the trial court properly limited Bryson's counsel's open-ended inquiries about possible mitigating evidence. *See id.* Also, the court rejected any argument that the trial court mismanaged voir dire. *See id.* at 282. After summarizing three days' worth of voir dire, the federal district court concluded that the limitations imposed on Bryson's counsel did not deprive petitioner of a qualified, unbiased jury. With respect to individual voir dire, the district court found no error,

because many of the remarks petitioner complained of were invited by petitioner's counsel, the prospective jurors making the remarks only expressed their own views and did not serve on the jury, and the remarks were not so prejudicial as to violate due process.

A defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors. *See Morgan*, 504 U.S. at 729. The trial court retains great latitude in conducting voir dire. *See Mu'Min v. Virginia*, 500 U.S. 415, 424, 427 (1991). Here, the voir dire was adequate to determine whether a prospective juror was qualified to serve. *See Moore*, 195 F.3d at 1170. The trial court's exercise of its discretion to disallow inquiry regarding mitigating evidence or individual voir dire did not render petitioner's trial fundamentally unfair. *Cf. Morgan*, 504 U.S. at 730 & n.5. Accordingly, we conclude the Oklahoma Court of Criminal Appeals' determinations were not contrary to or an unreasonable application of Supreme Court precedent.

## IX. HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATOR

Petitioner argues the heinous, atrocious, or cruel aggravator is unconstitutionally vague and therefore denied her a fair trial. This court has repeatedly upheld this aggravator as narrowed by the trial court. *See, e.g.,*

*Medlock v. Ward*, 200 F.3d 1314, 1319 (10th Cir. 2000) (citing cases). Also, this court has determined this aggravator has been consistently applied by the Oklahoma courts. *See, e.g.*, *LaFevers*, 182 F.3d at 721.

X. MURDER FOR REMUNERATION

Petitioner argues there was insufficient evidence to support the jury's finding of the murder for remuneration aggravator. She contends there was no evidence showing her awareness of the amounts of money in the joint bank accounts or the value of the insurance. She further contends the jury's decision was based on Bryson's hearsay statements she had no opportunity to cross examine. The Oklahoma Court of Criminal Appeals, on direct appeal, decided there was evidence this crime was motivated by financial gain. *See Plantz*, 876 P.2d at 281. The federal district court found ample evidence showing both that petitioner's involvement in the murder of her husband was motivated by the expectation of recovering the proceeds from his life insurance and that petitioner recruited McKimble and attempted to recruit others to kill her husband for remuneration.

After reviewing all of the evidence in the light most favorable to the State, a rational factfinder could have found the existence of this aggravating factor beyond a reasonable doubt. *See Lewis v. Jeffers*, 497 U.S. 764, 780-82 (1990). Petitioner planned the murder of her husband in order to collect the insurance

proceeds. She was present when Bryson offered to pay Farris if he would kill Mr. Plantz. She promised McKimble money from the life insurance proceeds if he would help with the murder. Regardless of any hearsay, the evidence was sufficient to support the jury's finding of this aggravator. The Oklahoma appellate court's determination that sufficient evidence supported this aggravator was not unreasonable.

## XI. INSTRUCTION ON MITIGATING EVIDENCE

Petitioner argues the trial court limited the mitigating circumstances the jury could consider. Respondent correctly argues this claim is unexhausted. Federal courts, however, may deny habeas relief on the merits of unexhausted claims. *See* 28 U.S.C. § 2254(b)(2). This court has considered and rejected an argument similar to petitioner's. *See Bryson*, 187 F.3d at 1209-10. We rely on that same analysis to deny petitioner's claim here.

## XII. EVIDENTIARY HEARING

Petitioner argues the district court erred in failing to hold an evidentiary hearing on her claim of ineffective assistance of counsel. Petitioner sought and was denied an evidentiary hearing in state court. Thus, AEDPA's limitations on evidentiary hearings, *see* 28 U.S.C. § 2254(e)(2), do not apply. *See Mayes*, 210 F.3d at 1287 n.2. Because petitioner's claim can be resolved on the record, we conclude the district court did not err in denying an evidentiary hearing. *See Trice v. Ward*, 196 F.3d 1151, 1159 (10th Cir. 1999), *petition for cert. filed,* (U.S. May 10, 2000) (No. 99-9518).

The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED.

Entered for the Court


Wade Brorby
Circuit Judge